[No. 4955–8–III.   Division Three.   October 13, 1983.]

THE STATE OF WASHINGTON, *Respondent,* v. LINDA C. EARLY, *Appellant.*

216

*David W. Henault, John B. Hancock,* and *Henault & Hancock,* for appellant.

*Donald C. Brockett, Prosecuting Attorney,* and *Fred J. Caruso, Deputy,* for respondent.

MUNSON, C.J.—Linda C. Early[1] appeals her conviction of first degree robbery[2] as an accomplice.[3] The issues are whether evidence which tied her and the principal to the Spokane area was the fruit of an unreasonable warrantless seizure of a Rand McNally Road Atlas from a suitcase locked in the trunk of her rental car; and whether the trial court erred in admitting a videotape of the robbery and in refusing to give an accomplice credibility instruction. Finding no error, we affirm.

On May 23, 1979, a local Rosauer's supermarket was

---

[1] Ms. Early has remarried since the original information was filed; her last name is now Wyscarver. For clarity, we will continue to refer to her as Ms. Early.

[2] RCW 9A.56.200 states in pertinent part:
"(1) A person is guilty of robbery in the first degree if in the commission of a robbery or of immediate flight therefrom, he:
"(a) Is armed with a deadly weapon; . . ."

[3] RCW 9A.08.020(2) states in pertinent part:
"(2) A person is legally accountable for the conduct of another person when:
". . .
"(c) He is an accomplice of such other person in the commission of the crime."

robbed by a lone gunman. Two witnesses in the parking lot indicated the robber went to a car containing a blond passenger. Neither witness could identify the passenger's sex. The Spokane County Sheriff's Department developed no leads in the robbery.

On June 21, 1979, a Big Star Food Store was robbed in Cary, North Carolina. The "getaway" vehicle was identified and traced to a local motel. Cary police contacted a man registered there under the name of John Giacetti. Mr. Giacetti was subsequently identified by two Big Star robbery victims; he and his motel companion, Linda C. Early, were arrested. Mr. Giacetti admitted his true name is George Albert Beardsley.

Pursuant to what a Cary, North Carolina, officer alleged was standard police procedure, the vehicle, an automobile rented by Linda C. Early and identified as the one used in the robbery, was impounded; the vehicle and all its contents, including suitcases, were inventoried. Although many maps and telephone pages were seized, the focus here is on a Rand McNally Atlas removed from one suitcase.

The atlas was given to the Federal Bureau of Investigation (FBI). The FBI drafted an informational flyer on George Albert Beardsley, giving his general description, his aliases, his arrest record, his modus operandi (M.O.), present FBI investigations, and stating a Rand McNally Atlas was seized subsequent to Mr. Beardsley's arrest in Cary, North Carolina. The flyer then stated:

> States in which cities were circled in Beardsley's Rand McNally Atlas include the following:
>
> . . .
> Washington.

The only reference in the flyer to Ms. Early occurred in the following statement:

> Beardsley was living at Number 4, Pine Place, with a Linda C. Early and, after arousing the suspicion of local police, FBI at Denver, Colorado, initiated an investigation regarding Beardsley under the alias of Giacetti, as he was depositing excessively large amounts of money, in

excess of $10,000, at a local bank and other individuals had observed Beardsley in possession of numerous firearms and large sums of money. The Denver Division of the FBI also developed information from local authorities at Broomfield, Colorado, indicating that Beardsley, under the alias of Giacetti, had travelled extensively to New York City, New York; Portland, Oregon; and Las Vegas, Nevada.

A Spokane County sheriff's detective had been visiting the local FBI agent's office on the day the flyer arrived. The detective recognized Mr. Beardsley's distinctive M.O. as the one used in the Rosauer's robbery. The detective wired for photographs of Mr. Beardsley. From a photo montage, Mr. Beardsley was identified by the robbery victims. Although the record is not clear whether the credit card investigation began locally, it appears the FBI obtained Ms. Early's Visa card account number and began tracing the use of the credit card in and around Spokane. Based on the evidence developed, both Mr. Beardsley and Ms. Early were charged with the Rosauer's robbery. Mr. Beardsley pleaded guilty to a charge of armed robbery and agreed to testify against Ms. Early in exchange for a recommendation of probation and restitution.[4]

Prior to trial, Ms. Early moved to suppress Mr. Beardsley's testimony and all evidence found here and in North Carolina. She alleged none of this evidence would have been developed but for the reference to the road atlas in the FBI flyer; therefore, both the testimony and credit card evidence were "fruit of the poisonous tree".

The trial court held, assuming the search was improper, the issue concerned how far the "fruit of the poisonous tree" doctrine would be extended. The trial court stated:

> Acting on information which the Spokane County Sheriff's office did not put together, but was provided, it went out and obtained a photo lineup and got an identi-

---

[4]Mr. Beardsley has been incarcerated already in one state and will be incarcerated probably in at least two additional states for his activities. The prosecutor apparently believed Mr. Beardsley's testimony was necessary to help convict Ms. Early.

fication. It then, as a result of that, made local investigations concerning local credit card charges, car rentals, airplane reservations, and was at that point able to focus in on both Mr. Beardsley and Ms. Early, and subsequently accomplished an apprehension and arrest for the Rosauers burglary.

All of the evidence necessary for conviction was obtained independently by the Spokane County Sheriff's office, operating on computerized databank kinds of information that are available to every law enforcement officer, and to say that local law enforcement officers cannot act on information received out of peril, that it may to some extent or another be generated by an unlawful search and seizure, is preposterous.

The court refused to suppress Mr. Beardsley's testimony or evidence generated by local authorities, but suppressed evidence obtained in North Carolina.

Ms. Early also contended at trial the chain of custody of the videotape of the robbery was not clearly shown. The State answered the objection by showing the tape was in the same condition at the time of trial as when placed in the property room. The court admitted the tape.

The court refused to give an instruction which stated the testimony of an accomplice "should be subjected to careful examination" and "acted upon with great caution." Relying upon *State v. Willoughby*, 29 Wn. App. 828, 630 P.2d 1387 (1981), the court believed the instruction was to be used in situations where the accomplice's testimony comprised the entire State's case; here, there was sufficient corroboration of the testimony. The court stated also the other instructions concerning Mr. Beardsley's credibility were sufficient; another caution would amount to a comment on the evidence.

██ Ms. Early first contends the trial court erred in refusing to suppress Mr. Beardsley's testimony and the credit card evidence. We do not believe it is necessary to address the reasonableness of the search. Assuming arguendo the search was unreasonable, we must still decide whether Mr. Beardsley's testimony and the credit card

information must be suppressed as "fruit of the poisonous tree". *Wong Sun v. United States*, 371 U.S. 471, 487–88, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963) states the test:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).

Evidence is inadmissible as "fruit of the poisonous tree" where it has been gathered by exploitation of the original illegality. *State v. Aydelotte,* 35 Wn. App. 125, 131, 665 P.2d 443 (1983). The issue is therefore whether the credit card evidence came from exploitation of the seized evidence; it is not whether the investigation began because of the seized evidence.

No serious challenge can be made to Mr. Beardsley's testimony. The record indicates clearly local authorities conducted an independent investigation which tied him to the Spokane area after receiving information in the FBI flyer concerning his method of operation. Nothing in the flyer alleges Mr. Beardsley had been to Spokane; Ms. Early's contention the flyer was sent only to cities circled in the atlas is not supported in the record. Evidence of Mr. Beardsley's local activities came after local witnesses identified him in a photo montage. The information therefore came from an independent source. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182, 183, 24 A.L.R. 1426 (1920); *State v. O'Bremski,* 70 Wn.2d 425, 423 P.2d 530 (1967). Further, *United States v. Ceccolini,* 435 U.S. 268, 55 L. Ed. 2d 268, 98 S. Ct. 1054 (1978) stated the testimony of a live witness must be measured by whether: (1) the illegal seizure played an important role in his decision to testify; (2) the witness testified voluntarily; (3) disqualification of the witness hampered the ascertainment of truth; and (4) the "road" between the

seizure and the testimony was sufficiently attenuated to break the chain of causation. Here, Mr. Beardsley's decision to testify was based apparently on the eyewitnesses who could identify him and his desire to obtain plea bargaining leverage. Furthermore, without his testimony Ms. Early's participation in this incident could not be shown. Mr. Beardsley's connection to this area came through independent investigation; thus, there was "sufficient attenuation . . . to dissipate" the taint of an illegal search. *See State v. Childress,* 35 Wn. App. 314, 316–17, 666 P.2d 941 (1983).

The claim that the credit card information should have been suppressed is only slightly different. *Nardone v. United States,* 308 U.S. 338, 341, 84 L. Ed. 307, 60 S. Ct. 266 (1939) is particularly instructive:

> The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire–tapping was unlawfully employed. Once that is established . . . the trial judge must give opportunity, however closely confined, to the accused to prove that *a substantial portion of the case against him was a fruit of the poisonous tree.* This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin.

(Italics ours.) One glaring weakness in Ms. Early's presentation has been her assertion the credit card charges would not have come to light but for the seizure of the maps. Ms. Early contends the FBI used the atlas to pinpoint cities to which she had traveled and then found the places in the city where she had used her charge card. This is not how this investigation was conducted. Once Mr. Beardsley and Ms. Early were in custody, FBI personnel used her name (not illegally seized) to obtain her Visa records. These records would show the business and city in which the charge card was used. She has not shown that any portion of the evidence came from exploitation of the seized map, nor has she carried her burden of showing a substantial portion of the case was developed from the unreasonable seizure.

Mr. Beardsley was the subject of an active investigation

already commenced by the FBI in Denver, Colorado. Ms. Early had already been connected with "Giacetti" in Colorado. When "Giacetti" was arrested in North Carolina, he volunteered that his name was Beardsley. With his true name, the FBI was able to further trace his activities, as has been explained in the FBI flyer. Ms. Early was implicated in the North Carolina robbery; although she was later released because of insufficient evidence, the FBI knew she had been traveling with Mr. Beardsley. Even without the atlas, it seems inevitable the FBI would connect Ms. Early and Mr. Beardsley to Spokane. It was a simple matter to obtain her charge account records which indicated her presence in or near Spokane on the day of the robbery. Evidence obtained from an independent source need not be suppressed. *State v. O'Bremski, supra.* To accept Ms. Early's contention, this court would have to assume the FBI disregarded all of the other evidence already compiled and was able to obtain the local information based solely on the page of an atlas. This we cannot do.

We therefore hold Ms. Early has not shown any of the evidence, including Mr. Beardsley's testimony, was fruit of the seizure of the atlas. We hold also this evidence would have been discovered inevitably and was generated from a source independent of the seizure. *State v. O'Bremski, supra; State v. Childress, supra.*

Ms. Early contends next a videotape of the robbery was not properly authenticated. She contends also the State did not show clearly the tape's chain of custody.

The videotape was properly authenticated by the testimony of the officer who took it into possession. There is no issue as to "when, where, and under what circumstances the [videotape] was taken, . . ." or that the tape actually portrayed what it purported to portray. *State v. Tatum,* 58 Wn.2d 73, 75, 360 P.2d 754 (1961). *Accord, Toftoy v. Ocean Shores Properties, Inc.,* 71 Wn.2d 833, 431 P.2d 212 (1967); *Kelley v. Great N. Ry.,* 59 Wn.2d 894, 371 P.2d 528 (1962); *State v. Newman,* 4 Wn. App. 588, 484 P.2d 473 (1971).

The chain of custody was sufficiently shown, even

with two lapses in the sheriff's evidence form; the tape was identified as the same object and in the same condition when admitted into evidence as it was when taken into possession. *State v. Music,* 79 Wn.2d 699, 489 P.2d 159 (1971), *vacated,* 408 U.S. 940, 33 L. Ed. 2d 764, 92 S. Ct. 2877 (1972); *State v. Russell,* 70 Wn.2d 552, 424 P.2d 639 (1967); *State v. Tretton,* 1 Wn. App. 607, 464 P.2d 438 (1969).

Ms. Early contends finally that the court erred in refusing to give the following instruction:

A principal is the chief actor or perpetrator of a crime. The testimony of the principal, given on behalf of the plaintiff, should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

Ms. Early does not contend a cautionary instruction is necessary in every case. She contends the court erred in deciding sufficient evidence of corroboration existed. We find sufficient corroboration existed so that the jury was not relying on the principal's testimony *alone. State v. Carothers,* 84 Wn.2d 256, 525 P.2d 731 (1974); *State v. Badda,* 63 Wn.2d 176, 385 P.2d 859 (1963); *State v. Jennings,* 35 Wn. App. 216, 666 P.2d 381 (1983); *State v. Willoughby, supra; State v. Calhoun,* 13 Wn. App. 644, 536 P.2d 668 (1975).

Ms. Early's conviction is affirmed.

McINTURFF, J., and EDGERTON, J. Pro Tem., concur.