[No. 27613-5-II. Division Two. February 7, 2003.]

THE STATE OF WASHINGTON, *Petitioner*, v. HERMAN GLENN, JR., *Respondent*.

542

*Gerald A. Horne, Prosecuting Attorney,* and *Sue L. Sholin, Deputy,* for petitioner.

*Rita J. Griffith,* for respondent.

SEINFELD, J. — The State charged Herman Glenn, Jr., a youth pastor, with child molestation and child rape. The trial court granted Glenn's motion to suppress statements that he made to a church elder about his alleged misconduct, finding that they were protected by the clergy/penitent privilege. We granted the State's motion for discretionary review, but finding no error, we affirm.

## FACTS

Glenn was a youth pastor at Bethel Christian Assembly Church in Tacoma (now the Church of All Nations). Church elder George Eide had a vision that caused him to believe that Glenn was involved with pornography. On Senior Pastor William Wolfson's advice, Eide contacted Glenn and arranged to meet with him to discuss the vision. During this meeting, Glenn confessed to misconduct, apparently with specified victims;[1] Eide left the room several times to tell Wolfson by phone about Glenn's statements.

---

[1] The trial court sealed the record regarding the confession.

Wolfson summoned Glenn to a meeting of the church's Council of Elders at Wolfson's house. Both ordained pastors and nonordained individuals attended the meeting, but details of Glenn's statements to Eide were not revealed. Glenn wanted to apologize personally to the church congregation and the victims' families, but Wolfson suggested that Glenn write letters to them instead.

After the meeting, Glenn went home with the church's financial director, Paul Hodgson, and drafted apology letters on Hodgson's computer.[2] Nonetheless, the church leaders ultimately decided to report Glenn's acts to the police.

The State charged Glenn with several counts of child molestation and rape of a child in the second and third degrees, alleging that he engaged in misconduct with multiple victims whom he knew through his role as youth pastor. Glenn moved to suppress (1) his statements to Eide, (2) the letters, and (3) the victims' statements to the police, asserting that the communication with Eide was privileged. He argued that the letters were part of his communication with Eide because the church required him to write them and, further, that because the police obtained the victims' names from Glenn's confession, the victims' statements were fruit of the poisonous tree.

After a hearing, the trial court rejected all of Glenn's arguments. Glenn sought reconsideration, providing additional evidence that Eide had conducted a marriage ceremony approximately nine months after Glenn's confession. The court concluded that this evidence indicated that the church considered Eide to be clergy; consequently, it reversed its earlier decision with regard to the statements Glenn made to Eide. But the court declined to suppress the other evidence.

The State moved for discretionary review and Glenn filed a cross-motion for discretionary review. We granted review of the issues raised by both parties.

---

[2] Wolfson testified that he did not know whether these letters were ever delivered to their intended recipients.

## DISCUSSION

■■■ The clergy/penitent privilege is a creature of statute, apparently having no root in the common law. *See* 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 501.89 (4th ed. 1999). RCW 5.60.060(3) provides:

A member of the clergy or a priest shall not, without the consent of a person making the confession, be examined as to any confession made to him or her in his or her professional character, in the course of discipline enjoined by the church to which he or she belongs.

For the clergy/penitent privilege to attach, the statements must have been made (1) to a member of the clergy (the necessary relationship), and (2) as a "confession . . . in the course of discipline enjoined by the church" (communication made in the right context). RCW 5.60.060(3). Further, the privilege applies only to confidential communications. *State v. Martin*, 91 Wn. App. 621, 632, 959 P.2d 152 (1998) (*Martin* I), *aff'd by State v. Martin*, 137 Wn.2d 774, 975 P.2d 1020 (1999) (*Martin* II).

■■■ To determine whether the privilege applies, the trial court asks whether (1) it attached to the statements at issue; and (2) the party claiming the privilege waived it. In this process, the trial court must determine several questions of preliminary fact, during which "it is not bound by the Rules of Evidence except those with respect to privileges." ER 104(a). In analyzing most privilege-related questions, the trial court applies the preponderance standard, inquiring whether the evidence *preponderates* in favor of the needed fact. *State v. Karpenski*, 94 Wn. App. 80, 102-03, 971 P.2d 553 (1999).

■■■■ We review the trial court's rulings on the admissibility of evidence for an abuse of discretion. *Eagle Group, Inc. v. Pullen*, 114 Wn. App. 409, 416, 58 P.3d 292 (2002). As the trial court is in the best position to weigh evidence and evaluate credibility, we defer to the trial court and limit our review to deciding whether the evidence is sufficient to support the trial court's rulings. *Karpenski*, 94 Wn. App. at

104; *In re Marriage of Woffinden*, 33 Wn. App. 326, 330, 654 P.2d 1219 (1982). In other words, we must determine whether, taking the record in the light most favorable to the party that prevailed on the question of fact at trial, a trial judge could reasonably find the fact to be more likely true than not true. *Karpenski*, 94 Wn. App. at 105-06.

## I. STATE'S APPEAL

A. Clergy

The trial court initially determined that Eide was not a member of the clergy. But after considering Glenn's motion for reconsideration and the additional evidence about Eide performing a marriage ceremony nine months after Glenn's alleged confession to him, the court concluded that Eide was clergy. The State argues that this was error, specifically contending that there is a lack of substantial evidence to support the trial court's findings of fact.

■■ RCW 26.44.020(11) provides, " 'Clergy' means any regularly licensed or ordained minister, priest, or rabbi of any church or religious denomination, whether acting in an individual capacity or as an employee or agent of any public or private organization or institution." The court has used this definition to determine the meaning of the term "clergy" in RCW 5.60.060(3). *State v. Buss*, 76 Wn. App. 780, 785, 887 P.2d 920 (1995). And *Martin II* recognized that to fit within the definition of "clergy," the person must be ordained. 137 Wn.2d at 783-84.

Eide testified that he was ordained before his conversation with Glenn. The State has not pointed to any contrary evidence. Thus, the trial judge could reasonably find by a preponderance that Eide was ordained and thus was "clergy" for purposes of the clergy/penitent privilege.

B. Confession

The trial court found that Glenn's statements to Eide constituted a confession within the meaning of the clergy/penitent privilege. The State argues that the record does not support this finding.

■■■■ The clergy/penitent privilege attaches only to "confession[s]." RCW 5.60.060(3). "Determination of the definition of 'confession' . . . is to be made by the church of the clergy member." *Martin II*, 137 Wn.2d at 787. "[T]he religious entity, and not the courts, should 'decide what types of communications constitute confessions within the meaning of a particular religion.' " *Martin II*, 137 Wn.2d at 786-87 (quoting *Martin I*, 91 Wn. App. at 628).

The courts usually strictly construe testimonial privileges, but they should not so construe the word "confession" in the clergy/penitent privilege. *Martin II*, 137 Wn.2d at 789. "A broad interpretation of 'confession' would 'minimize the risk that [RCW 5.60.060(3)] might be discriminatorily applied because of differing judicial perceptions of a given church's practices or religious doctrine . . . .' " *Martin II*, 137 Wn.2d at 789 (quoting *State v. MacKinnon*, 1998 MT 78, 288 Mont. 329, 337, 957 P.2d 23, 28). In *Martin I*, we found a communication was a "confession" because the clergy member receiving the communication considered it to be a confession. 91 Wn. App. at 628.

Glenn argues that the record reveals that Eide and Wolfson acted as if Glenn's statements were part of a process of confession and restoration. Eide testified: "I can define how our church would look at confession would be to confess your sins one to another, so that you may be healed[,]" and he recognized that "[s]cripture states of confessing your sins one to another." 2 Verbatim Report of Proceedings (VRP) (Feb. 8, 13, 2001) at 225, 227. But he also testified that the church did not have a "doctrine of confession" and that he did not consider Glenn's statements to be a "confession." 2 VRP at 224, 228.

Nonetheless, the trial court noted that the church's written materials contradicted the hearing testimony, specifically exhibits 32, 33, 34, 35, 36, and 43. Relying on these written materials, the trial court found that the church did have a doctrine of encouraging confession of sin and that Glenn's statements constituted such a confession.

These written materials support the trial court's finding. Exhibit 33 states that *"The Home Cell* is the basic building block of the church. It is, in fact, a mini-church. In a home-cell, edification takes place as members care for one another, using spiritual gifts and support systems."[3] And exhibit 35, entitled "EDIFICATION IN THE CELL—5[,]" describes the fourfold edification process as:

1. IDENTIFICATION: with the need of the person
- The Lord does His work at the *roots* of our problem
- Do not deal with <u>surface</u>, but root problems
- Is the person living in deception? An unhealthy dependence on another person?
2. CONFESSION: acknowledging the root cause

Further, several church members testified to the effect that the church had a concept or doctrine of confession, which was important to the church.

Eide met with Glenn to tell him about his troublesome vision, a vision of which he believed Glenn was the subject. According to Eide's testimony, his vision at its most specific point involved God saying "[p]ornography with active participation" with respect to Glenn. 2 VRP at 238. After Eide described the vision to Glenn, Glenn made statements to Eide.[4]

The record indicates that Glenn intended to make the same statements to Wolfson and that he disclosed to Eide because he believed Eide was acting in Wolfson's place. Specifically, both Glenn and Eide testified that after Eide told Glenn of his vision, Glenn said he had scheduled a meeting with Wolfson to discuss "these issues." 1 VRP (Feb. 5, 6, 2001) at 38. Eide then told Glenn that "[t]his is that meeting now." 1 VRP at 38.

---

[3] The church organization included subdivisions, called cells, each one operating as a "mini-church" where a parishioner could be known personally and ministered to individually. Ex. 33.

[4] The portion of the record describing these statements is sealed under trial court order.

Viewing the evidence in the light most favorable to Glenn, including sealed portions of the record; giving deference to the trial court's evaluation of the evidence and of witness credibility; and interpreting "confession" broadly, the trial court could reasonably find that (1) Eide's church acknowledged that confession is a component of edification, as described in exhibit 35, (2) after seeing his vision, Eide met with Glenn to identify the "root problems," as described in exhibit 35, and (3) Glenn confessed to Eide, "acknowledging the root cause" as described in exhibit 35. *Martin II*, 137 Wn.2d at 789 (" 'confession' . . . is defined by the religion of the clergy member receiving the communication"). Thus, the trial court did not err by finding that Glenn confessed to Eide for purposes of the clergy/penitent privilege.

## C. Confidentiality

The clergy/penitent privilege applies only to confidential communications. *Martin II*, 137 Wn.2d at 787; *Martin I*, 91 Wn. App. at 632. "Whether a communication is confidential turns on the communicant's reasonable belief that the conversation would remain private." *Martin I*, 91 Wn. App. at 632.

The State argues that the trial court erred by failing to address whether Glenn had a reasonable expectation that his statements to Eide would be kept confidential. It contends that Glenn could not have reasonably expected Eide to keep confidential the information involving child molestation and abuse.

The trial court found that Glenn had an expectation of confidentiality.[5] Specifically, the court found that under church doctrine, a confession included an expectation of

---

[5] Absent a specific finding of confidentiality by a trial court, we agree with the Advisory Committee's note on proposed Federal Rule of Evidence 506(a)(2), Communications to Clergymen, which states that because confidentiality turns on the communicant's subjective belief, it is reasonable to conclude, absent evidence of an intent to disclose, that the communication was confidential. Proposed Fed. Rev. Evid. 506 Advisory Committee's note (referencing proposed Rule 503(a)(4), Lawyer-Client Privilege); *see also* OR. REV. STAT. § 40.260(1)(a) (" 'Confidential communication' means a communication made privately and not intended for further disclosure . . . ."). Here, the State has not pointed to any evidence

confidentiality. Having found that Glenn's statements to Eide constituted a "confession" as defined by church doctrine, the court thus determined Eide expected that Glenn would keep his statements confidential.

Substantial evidence supports the court's finding. Exhibits 32, 34, and 36 emphasize the need to maintain confidentiality as to matters shared in church cells. Several church members testified that they expected confessions to remain confidential. And Glenn testified that when making his statements to Eide, "I trusted [Eide] in the same regard as a spiritual leader. . . . He was obviously in the role of somebody I could share these confidences with . . . ." 1 VRP at 39-40.

The State argues that Glenn did not have a reasonable expectation of confidentiality because he was aware of the church's policy of reporting child abuse. But according to the trial court's finding, the reporting policy did not apply to confessions to clergy or extend beyond statements to church counselors. Substantial evidence supports this finding.

D. Waiver

After speaking with Eide, Glenn attended a meeting where both ordained pastors and nonordained individuals were present. At the meeting, Glenn made general disclosures about having committed moral failures, but he did not reveal the specifics of his statements to Eide. He also drafted several letters to the victims.

The State argues that by doing so, Glenn waived any privilege that may have attached to his conversation with Eide. The State also argues that Glenn waived any such privilege by authorizing his attorney to depose Eide on November 1, 2000, with a deputy prosecutor present, about his conversation with Glenn.

---

establishing that Glenn intended or in any way anticipated that Eide would disclose his statements to anyone other than another clergy member, namely Wolfson. The State points only to evidence that the church had a policy of reporting child abuse. But the evidence does not establish that this policy applied to confessions to clergy.

 The State cites *Martin* II in support of its argument. 137 Wn.2d 774. *Martin* II held that otherwise privileged communications are not privileged if made in the presence of unnecessary, nonclergy third parties. 137 Wn.2d at 787. Thus, the statements Glenn made at the meeting are not privileged. But this did not destroy the privileged status of his earlier statements to Eide.

If Glenn authorized his attorney to depose Eide in the presence of a prosecuting attorney about the content of his statements to Eide, he waived any privilege that may have attached to those statements. *Martin v. Shaen*, 22 Wn.2d 505, 513, 156 P.2d 681 (1945) (regarding communications covered by the attorney/client privilege, " '[t]he client's offer *of his own or the attorney's testimony as to a part of any communication* to the attorney is a waiver as to the whole of that communication' ") (quoting 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2327, at 633 (3d. ed. 1940))). But as the State has not provided a record of Eide's November 1, 2000, deposition, we are unable to determine whether, and to what extent, Glenn waived any privilege that may have attached to his statements.

E. Free Exercise of Religion

The State argues that the trial court violated article I, section 11 of the Washington Constitution, which protects the free exercise of religion, by concluding that Glenn's statements to Eide constituted a "confession" as that term is used in the context of the clergy/penitent privilege. Specifically, the State argues that the church has a doctrine of protecting children and exposing sinners, and that the court has burdened the church's free exercise of this religious doctrine by "[inhibiting] the church's reporting of abuse[, making] the church a safe haven for admitted child molesters to hide without the knowledge of other parishioners." Br. of Appellant at 34.

 "To prevail in a free exercise case, the complaining party must show 'the coercive effect of the enactment as it operates against him in the practice of his religion[]' . . . [and] '[t]he challenged state action must some-

how compel or pressure the individual to violate a tenet of his religious belief.'" *Witters v. Comm'n for the Blind*, 112 Wn.2d 363, 371, 771 P.2d 1119 (1989) (citations omitted).

The trial court did not hold that the church could not report the contents of Glenn's statements. It merely said that Eide could not testify in court as to the contents of Glenn's statements. Further, RCW 26.44.060(1) and (3)[6] provide immunity from liability to those who report instances of child abuse, even if they obtain the information through conversations protected by the clergy/penitent privilege.[7] The State has failed to show that the trial court's action has a coercive effect against the church's religious practice of protecting children and exposing sinners. Thus, the constitutional challenge fails.

▮▮▮ Further, it is not clear that the State has standing to bring a constitutional free exercise challenge in this instance. A person has standing to raise constitutional questions when he or she has a personal stake in the outcome of the controversy. *Marchioro v. Chaney*, 90 Wn.2d 298, 303, 582 P.2d 487 (1978). The State lacks a personal interest in the church's free exercise of its religious doctrines.

---

[6] RCW 26.44.060(1) and (3) read:

(1)(a) Except as provided in (b) of this subsection, any person participating in good faith in the making of a report pursuant to this chapter or testifying as to alleged child abuse or neglect in a judicial proceeding shall in so doing be immune from any liability arising out of such reporting or testifying under any law of this state or its political subdivisions.

(b) A person convicted of a violation of subsection (4) of this section shall not be immune from liability under (a) of this subsection.

. . . .

(3) Conduct conforming with the reporting requirements of this chapter shall not be deemed a violation of the confidential communication privilege of RCW 5.60.060(3) and (4), 18.53.200 and 18.83.110. Nothing in this chapter shall be construed as to supersede or abridge remedies provided in chapter 4.92 RCW.

[7] Although *State v. Motherwell* held that clergy receiving information protected by the clergy/penitent privilege are not subject to the mandatory child abuse reporting requirements in chapter 26.44 RCW, the court also clearly noted that its holding did not prevent clergy from voluntarily reporting. 114 Wn.2d 353, 359, 788 P.2d 1066 (1990).

## II. Glenn's Cross Appeal

A. Timeliness of Cross Appeal

▉ The State argues that Glenn's cross appeal was not timely. Glenn notes that the State failed to timely object to the timeliness of his cross appeal and, further, that the appellate court exercised its power under RAP 18.8(a) "to enlarge the time in which an act must be done[,]" when it granted review of his cross appeal. Reply Br. of Resp't at 1.

RAP 5.1(d), 5.2 require a party bringing a cross appeal for discretionary review to do so within the later of 30 days after the act of the trial court to be reviewed, or 14 days after another party brings a timely notice for discretionary review. The State brought its notice for discretionary review on July 13, 2001. Glenn did not file his notice of cross appeal for discretionary review until August 10, 2001.

But we granted discretionary review of the issues that Glenn raised and the State failed to move for a modification of our ruling. Thus, we agreed to review the issues in Glenn's cross appeal.

B. Letters

After meeting with Eide, and later with Wolfson and the church Counsel of Elders, Glenn wrote letters to the victims and the church congregation. Glenn sought to suppress these letters, arguing they were protected by the clergy/ penitent privilege.

The trial court found that regardless of whether the clergy/penitent privilege attached to the letters, Hodgson was not acting in a clergy capacity when Glenn shared the letters with him at Hodgson's home and, thus, the privilege did not cover the letters.

On cross appeal, Glenn argues that he created the letters at Wolfson's direction and that Hodgson was an "indispensable assistant to Wolfson . . . ."[8] Br. of Resp. at 45. He urges us to follow federal authority holding that the clergy/

---

[8] Executive Pastor Julie Jenkins testified that Hodgson was not an ordained pastor.

penitent privilege is not vitiated simply because a nonclergy individual is present when the communication is made, so long as the individual is essential to the communication.

■ Glenn does not point to evidence showing that the letters constituted a "confession" for purposes of the clergy/penitent privilege. Rather, the record shows that he wrote the letters to the victims and the congregation and merely showed them to Wolfson and Hodgson. Thus, Glenn has failed to show that the clergy/penitent privilege attached to the letters, as is his burden. *Dietz v. Doe*, 131 Wn.2d 835, 844, 935 P.2d 611 (1997) (party claiming attorney-client privilege under RCW 5.60.060(2) bears burden of proving the attorney-client relationship existed).

C. Victim Testimony as Fruit of the Poisonous Tree

The trial court concluded that although the privilege protected Glenn's statements, it was not necessary to suppress the testimony of the victims contacted as a consequence of those statements. The court held that the doctrine of fruit of the poisonous tree does not extend to testimony discovered as a result of privileged statements.

On cross appeal, Glenn contests this ruling. He argues that "Washington courts have applied the exclusionary rule in instances unrelated to the Fourth Amendment . . . ."[9] Br. of Resp't at 47. We need not resolve this issue here because the State obtained the victims' names from independent sources.

■ At trial, the State presented the letters that Glenn wrote to specified victims. As we discussed above, Glenn has failed to show that the privilege applied to the letters. Thus, the victims' testimony was not the fruit of the poisonous tree. *See State v. Weller*, 76 Wn. App. 165, 168, 884 P.2d 610 (1994) ("Evidence is only inadmissible as 'fruit of the poisonous tree' if it has been gathered by exploitation of the

---

[9] None of the cases Glenn cites involve the doctrine of fruit of the poisonous tree, let alone extend the doctrine beyond Fourth Amendment violations. We note, however, that unlike Fourth Amendment cases, here we are dealing with a statutory privilege, not a constitutional right.

original illegality."); *see also State v. Early*, 36 Wn. App. 215, 221-22, 674 P.2d 179 (1983) (evidence obtained from independent source need not be suppressed under the fruit of the poisonous tree doctrine).

We affirm.

BRIDGEWATER and ARMSTRONG, JJ., concur.

Review denied at 149 Wn.2d 1007 (2003).