# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

STATE OF WASHINGTON,        )
                                        )     No. 73219-6-I
      Respondent,          )
                                        )     DIVISION ONE
      v.                              )
                                        )
ALAN JUSTIN SMITH,          )     UNPUBLISHED OPINION
                                          )
      Appellant.           )     FILED: January 9, 2017

SPEARMAN, J. — Alan Smith was convicted of first degree murder for killing his wife. He appeals, claiming that the trial court erred by admitting statements that were protected by the clergy-penitent privilege, and testimony regarding barefoot impression comparison analysis. We find no error and affirm.

## FACTS

On February 12, 2013, Susann Smith, wife of Alan Smith, did not show up for work. Her employer called the police, who went to her residence and found her lying face down in the bathtub. Her death was caused by multiple head injuries and asphyxia due to drowning.

At the time of her death, Susann had been separated from Smith for over a year and the two were in the midst of acrimonious dissolution proceedings. Smith was frustrated and angry with the way the proceedings were going and

was very concerned that Susann would take the children away from him and return to her home country of Germany.

Fall 2012, Smith was involved with a woman named Rachel Amrine. He told Amrine that he would like to just get rid of Susann and asked if she knew of a way to make that happen without anyone knowing. In a joking manner, they discussed the possibility of using potassium chloride or a rubber mallet to kill someone. When Smith again mentioned his desire to have Susann disappear, however, Amrine started to wonder if he was being serious.

Smith purchased a rubber mallet and a pair of disposable coveralls in October 2012. Forensic testing and analysis indicated that Susann's injuries were consistent with the type of mallet that Smith purchased, but did not conclusively establish that her wounds were caused by that type of mallet. Fabric impressions found at the scene were also consistent with the impressions that would have been left by the coveralls that Smith purchased.

Susann's body was found in the home she formerly shared with Smith. There were no signs of forced entry and the door was unlocked. Blood was found in the bedroom, the bathroom, and near the front door. There were bloody footwear impressions in the kitchen, the hallway, and leading to the front door. A hand towel found under the body contained Smith's DNA.

Based on surveillance footage and eyewitness accounts, there had been a man riding a bike near Susann's residence early in the morning on February 12, 2013. Smith had purchased a bicycle from Gregg's Green Lake in November

2012. A few weeks after Susann's death, the bike was found abandoned in a ravine across from Smith's apartment complex.

A global positioning system (GPS) device found in Smith's vehicle, provided data that allowed investigators to track Smith's movements. The Bothell police observed that on February 12, 2013, Smith made some detours from his usual daily route from home to his children's day care and then to his job at Boeing. That morning he stopped at some dumpsters in an Albertsons' parking lot after stopping at the day care center. Around 2:00 p.m., Smith left Boeing and drove in the vicinity of Susann's residence. The road leading to her home was barricaded, however, by police who were investigating her death. Smith then drove to a gas station and later returned to Boeing.

Smith's internet search history for February 2013 revealed searches for flights to Venezuela and Canada, initially for one adult and two children. After he was notified of his wife's death, however, he began to search for tickets for only one adult.

The investigation into Susann's death continued for a number of months During that time, in June 2013, Smith began dating a woman named Love Thai. Thai and Smith wanted to attend City Church's Belltown campus. They were told that because of their involvement in the homicide investigation they could not attend services at any of the City Church campuses or be part of the church's community groups.

Smith met Wendell Morris, a City Church group leader at a church-sponsored event. Sometime after learning that she and Smith could no longer

attend services at City Church, Thai contacted Morris's wife. The Morrises decided to meet with Thai and Smith to "minister the Word of God" to them. Verbatim Report of Proceedings (VRP) (4/14/14) at 192-194.

Morris had been an associate minister at Eastside Baptist Church (Eastside Baptist). He left Eastside Baptist in 2010 and joined City Church, intending to "lessen [his] profile" and "shed the title of 'associate minister.'" Id. at 177-78. In his words, he wanted to become merely "a man of God among other men of God." Id. After a year, Morris sought out additional opportunities with City Church and became a small group leader. Morris did not tell Smith that he had previously been an associate minister at Eastside Baptist.

Morris testified that he had agreed to meet Smith at a coffee shop in South Lake Union. When Morris arrived, Thai approached him, told him that Smith was outside in his car, and that he needed some support. Morris went to Smith's car and saw that Smith was upset. Morris told Smith that he had come "to point [him] to the Lord, [and] the Word of God." Id. at 196. Smith began to speak with Morris about some of his recent struggles.

Morris told Smith that he needed to know if Smith was involved in the murder of his wife. Smith looked around and expressed concern about how "safe" the area was. Id. at 201. Morris told Smith that whatever he said would stay between the two of them.

The two decided to take a walk, and then Smith said "[w]hat you asked me about in the car, the answer is yes." VRP (4/04/14) at 203. When asked for clarification, Smith stated, "'I did it to her,'" and became emotional. Id. at 204.

4

Smith then looked at Morris and stated "I trust what you do with this information." Id. Morris understood Smith's comment to mean that he had Smith's permission to take his statements to the authorities.

Smith and Morris continued their conversation and Smith indicated that he would like to be baptized. Morris decided that they could go that day to the Citadel church in Des Moines, because it was open late. When they arrived at the Citadel they discovered that the church did not have a baptistery. Morris had mentioned earlier that he could possibly baptize Smith and he agreed to do so at Alki beach in West Seattle.

During the next few days, Morris contacted Smith by phone and text message to try to persuade him to speak with the authorities. When Smith declined to turn himself in, Morris called the police on June 25, 2013.

Smith was charged with first degree murder with a deadly weapon, with the aggravating factor of domestic violence. He moved to suppress evidence of his statements to Morris. At the suppression hearing, the court heard testimony from ministers from Eastside Baptist and City Church.

Pastor Arthur C. Banks, from Eastside Baptist Church, Tacoma, testified that an ordained minister for his church is one who has been examined by several churches within the denomination and has received a recommendation that he or she has met the spiritual qualifications to be ordained. If Eastside Baptist accepts the recommendation, then that person is ordained, and he or she can perform all of the functions of a pastor without supervision.

Pastor Banks further testified that Morris had become a licensed associate minister with Eastside Baptist. He explained the role of the licensed associate ministers and that they may only perform duties at Eastside Baptist under the supervision of the pastor. For example, a licensed associate minister would not be able to perform a baptism, communion, wedding, or funeral without being supervised by the pastor.

Pastor Banks confirmed that when Morris joined City Church, he became a member of that church and was no longer a member of Eastside Baptist. At that point neither Eastside Baptist nor Pastor Banks had any authority over Morris. The pastor also testified that Eastside Baptist does not have an organized confession but asks its congregation to confess to God; on occasion when Pastor Banks counsels members, he tells them upfront that he reserves the right to notify the authorities if they have done anything harmful or illegal.

Pastor Jason Michalski from City Church testified that its policies require church staff to inform their members that any information they share may be disclosed to other staff members, and that the church reserves the right to report the content of a disclosure to the authorities. He also explained that City Church is "not a church that necessarily you need to go confess your sins to a pastor or a leader or anyone." VRP (4/14/14) at 140. Pastor Michalski also testified that the "City Groups" were small community groups of members that would meet outside of service to discuss particular topics or portions of scripture. Pastor Michalski confirmed that Morris served as a City Group leader, but testified that Morris was never a licensed or ordained minister at City Church.

The trial court found that Morris was not acting as a member of the clergy for Eastside Baptist when he spoke with Smith and that he did not have any authority from Eastside Baptist to counsel anyone or perform a baptism. The trial court also found that Morris never became a licensed or ordained minister with City Church and that he was not acting as a City Group leader when he spoke with Smith. While it was undisputed that Morris told Smith that their conversation would stay between the two of them, the trial court determined that the communication was not confidential because Morris was acting in his individual capacity. The trial court also found Smith's statement — "I respect what you do with this information" — led Morris to believe that Smith understood that he would go to the civil authorities with the information. Based on these findings, the trial court concluded that Smith had not sustained his burden of showing that his statements were protected by clergy-penitent privilege.

At trial, the State presented photographs of bloody footwear impressions found in the kitchen and bathroom of Susann's residence. Sgt. Shelly Massey, a forensic identification specialist for the Royal Canadian Mounted Police, compared these photographs to inked impressions of Smith's feet (bare and wearing socks). Sgt. Massey testified that based on the impression left at the scene, she was "unable to exclude and in fact ... would include Mr. Smith as a possible source of who could have made this particular impression." Id. at 64. Smith moved the court for a Frye[1] hearing to determine the admissibility of Sgt. Massey's testimony, arguing that the use of barefoot morphology evidence is not

_____

[1] Frye v. United States, 93 F. 1013 (D.C. Cir. 1923).

generally accepted in the scientific community. The trial court denied the motion because Sgt. Massey made a physical comparison of the prints and could not state an opinion more definite than that Smith was a "'possible' maker of the footprints." CP at 890.

Smith was found guilty and sentenced to 344 months. Prior to sentencing, Smith moved for new counsel, arguing that he had received deficient representation and that he and his attorney had an irreconcilable conflict. The trial court found that any conflict between Smith and counsel arose from differences of opinion with regard to trial tactics, and that his complaints did not rise to the level of ineffective assistance of counsel. He appeals.

## DISCUSSION

Smith contends that the trial court erred when it denied his motion to suppress his "confession" because it was protected by the clergy-penitent privilege. He argues that Morris was acting as a member of the clergy when he heard Smith's confession, because he was a licensed minister at Eastside Baptist.

Our review of findings of fact following a suppression motion is limited to "those facts to which error has been assigned." State v. Hill, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). Where there is substantial evidence in the record supporting the challenged facts, those facts will be binding on appeal. Id. Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding. State v. Halstien, 122 Wn.2d 109, 129, 857 P.2d 270 (1993). Unchallenged findings of

fact will be accepted as verities on appeal. Hill, 123 Wn.2d at 647. We review de novo the trial court's conclusions of law. State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999) abrogated by Brendlin v. California, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007).

The clergy-penitent privilege is statutory and has no apparent origin in the common law. State v. Glenn, 115 Wn. App. 540, 546, 62 P.3d 921 (2003). RCW 5.60.060(3) provides:

> A member of the clergy, a Christian Science practitioner listed in the Christian Science Journal, or a priest shall not, without the consent of a person making the confession or sacred confidence, be examined as to any confession or sacred confidence made to him or her in his or her professional character, in the course of discipline enjoined by the church to which he or she belongs.

The privilege is held by the penitent and only the penitent can waive it. RCW 5.60.060(3). For the privilege to attach, statements must be (1) confidential communications, (2) made to a member of the clergy, (3) as a confession. State v. Glenn, 115 Wn. App. 540, 546, 62 P.3d 921 (2003). In this process the trial court must determine several questions of preliminary fact, during which it is not bound by the rules of evidence, except those that pertain to privileges. Id.

Under RCW 26.44.020(6), "clergy," means "any regularly licensed or ordained minister, priest, or rabbi of any church or religious denomination, whether acting in an individual capacity or as an employee or agent of any public or private organization or institution." Such person must be ordained in order to be considered a member of the "clergy." State v. Martin, 137 Wn.2d 774, 783-84, 975 P.2d 1020 (1999).

Smith argues that Morris was a licensed minister with Eastside Baptist Church when they spoke, and therefore Morris qualified as a member of the clergy to whom Smith made his confession. But Smith does not challenge the trial court's finding of fact that "[w]hen Morris joined City Church, he ceased to be a member of Eastside Baptist."[2] CP at 864. He is therefore not a "licensed minister" for the purposes of the statute. Furthermore, "[s]imply establishing one's status as 'clergy' is not enough" for the privilege to apply; the person "must also be functioning in that capacity . . . . State v. Motherwell 114 Wn.2d 353, 358, 788 P.2d 1066 (1990).[3] Here, even if Morris had maintained his status as a licensed minister with Eastside, it is clear from the record that he was not acting in that capacity when he and Smith met. Morris had no authority to act on behalf of Eastside without the pastor's supervision.

Smith next argues that he made a "confession" that Morris heard as part of his duties as a minister of City Church. He contends that Morris met with him intending to convince him to confess his sins and stay true to his conversion and faith. He also claims that because City Church had no specific policy on confession, it was likely that Morris's actions were enjoined by City Church

---

[2] Smith challenges only one factual finding—that Morris was not an ordained minister with Eastside Baptist. There is no evidence in the record that Morris was ever ordained; he held only a license with Eastside Baptist, which he later gave up when he became a member of City Church. The trial court's finding is not erroneous.

[3] Motherwell is often cited as authority in regards to interpreting the clergy-penitent privilege, even though it interpreted the mandatory reporting exemption for clergy. See Jane Doe v. The Corp. of the Pres. of the Church of Jesus Christ of Latter-Day Saints, 122 Wn. App. 556, 563, 90 3d. 1147 (2004); State v. Buss, 76 Wn. App. 780, 785, 887 P.2d 920 (1995), abrogated by Martin, 137 Wn.2d 774, 975 P.2d 1020 (1999); Glenn, 115 Wn. App. at 553 at n.7.

practice or rules. The determination of what constitutes a "confession" for the purposes of RCW 5.60.060(3) is to be made by the church of the particular clergy member, not the court. Martin, 137 Wn.2d at 787. The record shows that City Church did not have a confession practice, and its policies specified that any information revealed in counseling was not confidential. As a result, Smith has not shown that his statements to Morris were a "confession" to which the clergy-penitent privilege would attach.

Smith next argues that his disclosure was privileged because he believed that his statements were confidential based on Morris's assurances. Confidentiality is a requirement for establishing the clergy-penitent privilege. Martin, 137 Wn.2d at 789–90. Here, Smith may have intended and/or believed that his statements would be confidential, but neither are sufficient to establish a statutory privilege if none of the other requirements are met.

We conclude that Smith has not shown that his statements are protected by the clergy-penitent privilege. The trial court properly denied his motion to suppress on that ground.

Smith next argues that Sgt. Massey's testimony comparing the foot impressions found at the scene of the homicide, to those taken from Smith should, not have been admitted. He contends that in making the comparisons, Sgt. Massey employed scientific, technical, or specialized knowledge that was not generally accepted in the scientific community. He contends that at the very least, the court should have held a Frye hearing to consider its admissibility. The State argues that a Frye hearing was not necessary because the testimony

involved a physical comparison rather than a scientific test and the witness's only conclusion was that Smith could not be excluded as a possible source of the impressions.

We review the trial court's decision to admit or deny evidence under the Frye standard de novo. State v. Cauthron, 120 Wn.2d 879, 887, 846 P.2d 502 (1993), overruled in part on other grounds by State v. Bruckner, 133 Wn.2d 63, 941 P.2d 667 (1997). The trial court's determination of whether expert testimony is admissible under ER 702 is reviewed for an abuse of discretion. Id. at 890.

Washington courts employ the Frye test to determine if evidence based on novel scientific procedures is admissible at trial. Cauthron, 120 Wn.2d at 887. The two-pronged test asks, "(1) whether the scientific theory upon which the evidence is based is generally accepted in the relevant scientific community, and (2) whether the technique used to implement that theory is also generally accepted in the relevant scientific community." State v. Gentry, 125 Wn.2d 570, 585, 888 P.2d 1105 (1995). A third prong that asks whether the generally accepted technique was performed correctly goes to the weight of the evidence, not to its admissibility. Id.

The Frye test is appropriate to those situations in which the scientific evidence has the potential to mislead lay jurors, who may be awed by the apparent infallibility of scientific experts and their techniques. State v. Brewczynski, 173 Wn. App. 541, 558, 294 P.3d 825 (2013). Smith argues that a Frye hearing was necessary here because, in his view, Sgt. Massey employed a scientific process that had not been found to be generally accepted as reliable by

the scientific community. Br. of Appellant at 28. The State argues that under Brewczynski, the analysis Sgt. Massey offered was a physical comparison, not a scientific test, and a Frye hearing was not required. The State is correct.

In Brewczynski, the defendant challenged the expert's technique for footwear comparison, arguing that it was not generally accepted in the community of footwear experts. 173 Wn. App. at 555. The expert made an impression of the suspect's boot by shaping clay around the bottom and sides, and then comparing the image with the overlay of a print found at the scene. The expert concluded that Brewczynski's right boot had a similar tread pattern and size and could have made the print. Id. The court rejected Brewczynski's argument that a Frye hearing was necessary because the method used by the expert was a matter of physical comparison rather than a scientific test. "'In such cases, the jury is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions.'" Id. at 556 (quoting State v. Hasan, 205 Conn. 485, 490, 491, 534 A.2d 877 (1987)).

Similarly here, Sgt. Massey did nothing more than make a visual comparison of photographs of the foot impressions at the crime scene and those taken from Smith. The trial court did not err when it denied Smith's request for a Frye hearing.

Smith also argues that barefoot morphology has not garnered general acceptance in the scientific community. He points out that while Washington has not considered the scientific acceptability of barefoot morphology analysis, other

13

states have found that such evidence was not sufficiently reliable to pass a Frye test and be admitted at trial. He cites State v. Jones, 514 S.E. 2d 813, (S.C. 2001) ("Jones I"), 681 S.E.2d 580 (S.C. 2009) ("Jones II"), and State v. Berry, 546 S.E.2d 145 (N.C. App. 2001), as instances where the courts rejected barefoot morphology evidence. These cases are not persuasive, however, because they involve different standards for admission and expert opinion testimony that resulted in a conclusive identification. Neither North Carolina nor South Carolina courts use the Frye standard for admissibility. Jones II, 681 S.E.2d at 590; State v. Goode, 461 S.E.2d 631, 645 (N.C. 1995). And in the Jones cases and in Berry, the experts offered testimony based on barefoot impression that positively identified the defendant as the maker of the print. The courts found the method not to be sufficiently reliable to support the admission of such testimony. Jones I, 541 S.E. 2d at 818, Jones II, 681 S.E.2d at 591, and Berry, 546 S.E.2d at 149, 154.

The State argues that this case is the most similar to State v. Kunze, 97 Wn. App. 832, 988 P.2d 977 (1999) which found that the scientific reliability of the method was irrelevant to whether the evidence was admissible. In that case the court considered ear-print identification evidence and found it to be inadmissible, because the majority of testifying experts indicated that it was not generally accepted in the scientific community. The appellate court was explicit, however, that upon retrial, there would be no bar to testimony stating that the defendant could not be excluded as a possible maker of the print left at the scene. Id. at 856. The Kunze court found that this type of comparison — "an

'eyeballing' of readily discernible similarities and differences — is based on 'visual techniques'... or, ... on personal knowledge that can readily be understood and evaluated by the jury," and "need not be supported by a showing of general acceptance. Id.

Here, Sgt. Massey described how she compared footprints by analyzing:

"the shape of the foot, the location of the tow (sic) pads, the specific space that each towed (sic) pad takes up, the distance of various tow (sic) pads to what we call the met tar sell (sic) ridge, or the front edge, leading edge of the balance ball of the foot, the width and shape of the ball of the foot, the widths of the arch, the heal (sic), the overall length of the foot, so a combination of these features is what we are looking at."

VRP (1/23/15) at 30. Her conclusion was not that Smith "did make the prints, it's that he could have made them." Id. at 93. Sgt. Massey's process and conclusion is similar to the testimony about ear print evidence that was admitted without a Frye hearing in Kunze. We find no error in the admission of Sgt. Massey's testimony regarding the physical comparison of Smith's prints to the prints found at the scene.[4]

Smith argues that his constitutional right to effective assistance of counsel was violated when the trial court refused to grant his motion for new counsel. We review the denial of a motion to substitute counsel for an abuse of discretion. State v. Lindsey, 177 Wn. App. 233, 248, 311 P.3d 61 (2013), review denied, 180 Wn.2d 1022 (2014). A trial court abuses its discretion when its decision is "'manifestly unreasonable or based upon untenable grounds or reasons.'" State

---

[4] Smith does not argue that the trial court abused its discretion when it admitted the evidence under ER 702. Even if it had been error to admit the testimony, it would have been harmless. Based on all of the other evidence against Smith, there is no basis for us to conclude that the outcome of the trial would have been different had the evidence not been admitted.

v. Garcia, 179 Wn.2d 828, 844, 318 P.3d 266 (2014) (quoting State v. Lamb, 175 Wn.2d 121, 127, 285 P.3d 27 (2012).

A defendant must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant. State v. Varga, 151 Wn.2d 179, 200, 86 P.3d 139 (2004). A substitution may be justified when the attorney-client relationship is plagued by things that suggest that the attorney cannot provide diligent representation. In re Personal Restraint of Stenson, 142 Wn.2d 710, 724-31, 16 P.3d 1 (2001). However, a defendant must show more than a general loss of trust or confidence. State v. Schaller, 143 Wn. App. 258, 268, 177 P.3d 1139 (2007).

To determine whether Smith was entitled to new counsel, we examine three factors: (1) the extent of the conflict, (2) the adequacy of the trial court's inquiry into the conflict, and (3) the timeliness of the motion for substitution of counsel. State v. Cross, 156 Wn.2d 580, 607, 132 P.3d 80 (2006). Here, Smith argues only that the trial court failed to undertake an adequate inquiry into the conflict. A trial court must inquire into "(1) the reasons given for the dissatisfaction, (2) the court's own evaluation of counsel, and (3) the effect of any substitution upon the scheduled proceedings." Stenson, 142 Wn.2d at 723.

At the hearing, Smith first raised various points and arguments that he felt should have been part of his defense, including DNA analysis and greater emphasis on the timing of events. He further argued that counsel failed to provide more strident advocacy regarding witness credibility, and that his

16

external circumstances, such as media attention and his children's dependencies, should have been brought to the court's attention.[5]

Contrary to Smith's contention, the trial court considered each of the Stenson factors in detail on the record. First, the court found that many of the reasons for Smith's dissatisfaction, e.g., the points he wanted counsel to emphasize, were either heard by the judge, or irrelevant to his defense. The other points of dissatisfaction were found to be "trial strategy decisions which must rest with the lawyers. . . ." (VRP 2/25/15) at 32. Second, the court reviewed the file and found that Smith had been diligently represented throughout. And finally, the trial court found that substituting counsel prior to sentencing would delay the imposition of a sentence for an undetermined period of time. Based on the trial court's inquiry, we find no abuse of discretion in denying Smith's motion to substitute counsel.

---

[5] Smith compares his case to the conflict between client and counsel found in United States v. Williams, 594 F.2d 1258, 1259 (9th Cir. 1979) and Frazer v. United States, 18 F.3d 778, 785 (9th Cir. 1994), by way of Stenson, 142 Wn. 2d at 724. In Williams, the Ninth Circuit held that the District Court erred when it denied the defendant's request, after a strong showing of irreconcilable conflict, where even "the response of counsel tended to confirm that the course of the client-attorney relationship had been stormy one with quarrels, bad language, threats, and counter-threats." 594 F.2d at 1260. In Frazer, the defendant's attorney called him a "'stupid nigger son of a bitch and said he hopes I get life. And if I continue to insist on going to trial I will find him to be very ineffective." 18 F.3d at 780. There is nothing in the record that suggests that the issues between Smith and his lawyers even approached this level of conflict.

## Statement of Additional Grounds

In his pro se statements of additional grounds, Smith lists over thirty additional errors.[6] Several of his claimed errors have either been addressed by counsel or are not proper matters for a statement of additional grounds under RAP 10.10(a). These include the admission of forensic evidence, the denial of his motion for alternate counsel, and the admission of his confession. Smith also asks the court to reweigh the evidence and make alternate findings regarding witness credibility. These are issues for the trier of fact that cannot be reviewed on appeal. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Smith's other additional grounds for error include ineffective assistance of counsel, sufficiency of the evidence, prosecutorial misconduct, probable cause for search and arrest warrants and admissibility of evidence.

Smith argues that he was deprived of his right to a defense because he was subject to coercion by counsel and law enforcement. He argues that his statements and his consent to search were made under threats that he would not be able to see his children. We are unable to review these claims because they rely on facts or evidence not in the record. While they may be properly raised in a personal restraint petition, we will not consider them here. State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

---

[6] Smith also submits an amendment to his statement of additional grounds (SAG) where he explains why he filed a SAG. In this Amendment he claims that the trial court erred by failing to hold a voluntariness hearing with regard to the confession and that both trial and appellate counsel were ineffective for failing to raise the issue. The record contains nothing, however, that suggests the confession was not voluntary, nor does Smith provide any basis for a finding of involuntariness.

A successful ineffective assistance of counsel claim requires the defendant to show that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish deficient representation, the defendant must show that counsel's representation "f[ell] below an objective standard of reasonableness." State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Courts presume that counsel provided effective representation and require the defendant to prove that no legitimate strategic or tactical reasons exist. Id. "Prejudice" for this purpose is the "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Smith fails to articulate any respect in which he was prejudiced by the acts or omissions about which he complains. His challenge fails on this basis alone. We need not consider both prongs of Strickland (deficient performance and prejudice) if a petitioner fails one prong of the test. 466 U.S. at 697.

Smith next argues that his conviction is not supported by sufficient evidence, presumably excluding his confession. Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, any rational trier of fact could have found that each element of the crime was proved beyond a reasonable doubt. State v. Drum, 168 Wn.2d 23, 34-35, 225 P.3d 237 (2010). We draw all reasonable inferences from the evidence in the State's favor and interpret the evidence most strongly against the defendant. State v. Joy, 121

Wn.2d 333, 339, 851 P.2d 654 (1993). We assume "the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 820 P.2d 1068 (1992). Here, there is ample evidence in the record upon which a reasonable trier of fact could find each element of first degree murder beyond a reasonable doubt.

Smith raises other additional grounds related to the trial court's admission of evidence. We review the trial court's admission of evidence for abuse of discretion. State v. Pirtle, 127 Wn.2d 628, 648, 904 P.2d 245 (1995). "'A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds.'" State v. Perrett, 86 Wn. App. 312, 319, 936 P.2d 426 (1997) (quoting Havens v. C & D Plastics, Inc., 124 Wn.2d 158, 168, 876 P.2d 435 (1994)). Smith has not shown that any of the challenged decisions to admit evidence were unreasonable or untenable.

Smith challenges the trial court's denial of his motion to suppress arguing that there was no probable cause for arrest and that the police improperly obtained evidence without a warrant. He fails to identify, however, any finding of fact to which he assigns error regarding probable cause for either his arrest or any of the search warrants. Nor does he explain the insufficiency of evidence at the suppression hearing that would make the findings erroneous.

Finally, Smith raises issues of prosecutorial misconduct, arguing that the State's questioning elicited improper opinion testimony about Smith's silence and his guilt. Prosecutorial misconduct is grounds for reversal if the conduct is both improper and prejudicial. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551

(2011). We evaluate a prosecutor's conduct by examining it in the full trial context, including the evidence presented, the argument, the issues the evidence addressed in argument, and the jury instructions. Id. A defendant suffers prejudice only where there is a substantial likelihood that the prosecutor's misconduct affected the jury's verdict. Id. Here, Smith does not identify the challenged conduct with sufficient specificity to enable us to evaluate it. We conclude that none of Smith's additional grounds for appeal have merit.[7]

Affirmed.

Spec/man, J.

WE CONCUR:

---

[7] Smith moved to modify the denial of his attorney's motion to withdraw as counsel on this appeal. The motion is denied.